**Diane MULLINS, Surviving Spouse and Personal Representative of the Estate of Michael David Mullins, Deceased, Plaintiff/Appellee,**

v.

**HARLEY–DAVIDSON YAMAHA BMW OF MEMPHIS, INC., Defendant/Cross–Plaintiff/Appellee,**

v.

**HONG JIN CROWN CORPORATION, Defendant/Cross–Defendant/Appellant,**

and

**Sullivan Brothers Distributors, Defendant/Cross–Defendant/Appellee.**

Court of Appeals of Tennessee, Western Section, at Jackson.

January 16, 1996.

Application for Permission to Appeal Denied by Supreme Court May 20, 1996.

**908** ■

J. Cecil McWhirter, Paul M. O'Brien, McWhirter & Wyatt, Memphis, for Defendant/Cross–Defendant/Appellant, Hong Jin Crown Corporation.

Fred M. Ridolphi, Jr., Humphreys Dunlap Wellford Acuff & Stanton, P.C., Memphis, for Plaintiff/Appellee, Diane Mullins.

Jerry E. Mitchell, Rebecca Adelman, Thomason, Hendrix, Harvey, Johnson & Mitchell, Memphis, for Defendant/Cross–Plaintiff/Appellee, Harley–Davidson Yamaha BMW of Memphis, Inc.

Robert L.J. Spence, Jr., The Hardison Law Firm, Memphis, for Defendant/Cross–Defendant/Appellee, Sullivan Brothers Distributors.

FARMER, Judge.

This is an interlocutory appeal by Appellant, Hong Jin Crown Corporation (HJC),

from the trial court's denial of its motions to dismiss, as to Appellee, Harley–Davidson Yamaha BMW of Memphis, Inc. (Harley–Davidson), on the grounds of lack of personal jurisdiction and the running of the statute of limitations, and as to Appellee, Diane Mullins (Mullins), on the additional ground of insufficiency of process and service of process.

This matter stems from a vehicular accident in Memphis on September 4, 1990, resulting in the death of Mullins' husband. Mullins filed suit as the surviving spouse and personal representative of the estate, on August 20, 1991, against HJC, Harley–Davidson and Sullivan Brothers Distributors (Sullivan Brothers). Mullins alleged that the accident occurred when an automobile improperly and unlawfully turned into the path of a motorcycle driven by the deceased.[1] It was further alleged that at the time of the incident, the deceased was wearing a defectively designed and manufactured motorcycle helmet which caused or allowed his death. Harley–Davidson filed cross claims against both Sullivan Brothers and HJC for indemnity and contribution in the event it was found liable to Mullins.

The trial court summarized the underlying facts of this case, in its order granting HJC's interlocutory appeal, as follows:

[HJC] manufacturers [sic] motorcycle helmets in the Republic of Korea. [HJC] sold the motorcycle helmet in question to [Sullivan Brothers], one of its three United States distributors of motorcycle helmets, which is located in the State of Massachusetts.[2] [HJC] shipped the helmet in question from its plant in Korea to [Sullivan Brothers] in Massachusetts. [Sullivan Brothers] then sold the motorcycle helmet to [Harley–Davidson], a retailer in the State of Tennessee, and Sullivan Brothers shipped the said motorcycle helmet to the said retailer in the State of Tennessee. [Mullins] subsequently purchased the motorcycle [helmet] from the retailer in the State of Tennessee.

1. The record suggests that a settlement was reached between Mullins and the driver of the automobile.

2. The other distributors are Helmet House in West Village, California and Castle Sales in Greenbay, Wisconsin.

The affidavit of Scott S. Hong, the vice president of HJC, further reveals: HJC manufactures motorcycle helmets in its factory in South Korea; it maintains no offices or places of business in the United States. HJC sells its motorcycle helmets directly to the aforementioned distributors. Each distributor is "free to sell to any dealer of their choosing anywhere in the United States." HJC does not sell directly to dealers and does not suggest names of dealers to any of its distributors. HJC does not sell motorcycle helmets or any other products directly into the State of Tennessee. HJC transacts no business within the state; it maintains no offices or agents and owns no property within the state. HJC did not create or control the distribution system which brought any of its products into the state. HJC does not advertise or participate in the costs of advertising any of its products and does not solicit business in the state. Finally, HJC does not participate in the promotion, or pay any incentives for the promotion, of its products in Tennessee.

Hong's deposition indicates: HJC began distributing motorcycle helmets in the United States in 1986. Hong is an officer and director of both HJC and HJC America. HJC America is a California corporation involved with "[s]ales, marketing, exhibition shows and conducting studies in terms of color preferences, . . . with respect to new motorcycle accessories, . . . anything that would be deemed helpful towards the sales efforts." HJC America has contact with the three American distributors. The FG–2 helmet, the model in question, was first manufactured in September 1989 and HJC possessed written documentation that it complied with U.S. standards and regulations. Department of Transportation "D.O.T." standards or specifications do not exist in Korea. The shell size or configuration of HJC helmets is different for American as opposed to Asian heads. The helmet was distributed in the United States with the letters "D.O.T." affixed thereon. HJC participates in approximately 10 trade shows world wide each year. Hong does not know where HJC helmets are currently sold in the United States. HJC was never aware to whom its helmets were ultimately sold or to whom they were sent to in the United States, "nor could [they] get involved in that aspect." HJC never instructed its distributors to forego sales in Tennessee or any other specified locale. In reference to HJC's anticipation of nationwide sales, Hong stated, "[w]e did not know America at all, so we just simply figured that the end buyers were all up to the distributors seeking them out."

According to the deposition of Robert Sullivan, Sullivan Brothers' market covers the entire United States. The record indicates that between 1989 to 1992, HJC shipped 543,897 motorcycle helmets, of its total production of 931,106, to the United States.

HJC frames the issues on appeal as follows:

1. Whether [HJC's] constitutional rights were violated under the 14th Amendment to the United States Constitution when the trial court denied [HJC's] motion to dismiss for lack of in personam jurisdiction where [HJC], a foreign corporation, has no contacts with the forum; has not availed itself of the privilege of conducting activities within the forum; and [HJC's] conduct is such that it could not anticipate being hauled into Tennessee Courts.

2. Whether the trial court erred in denying [HJC's] motion to dismiss the original complaint for insufficiency of process and insufficiency of service of process where the plaintiff failed to return service of process within thirty days and where the plaintiff failed to apply for and obtain issuance of new process within six months or recommence the action within one year.

3. Whether the trial court erred in not dismissing the original complaint as being barred by the statute of limitations where the plaintiff failed to obtain new process within six months or recommence the lawsuit no later than one year from issuance of the process · which was not served or returned thirty days from issuance.

The issue which we find dispositive in this case is whether the trial court's exercise of *in personam* jurisdiction over HJC, a foreign

corporation, comports with the due process clause of the 14th Amendment.

In determining whether or not a state can assert long-arm jurisdiction, due process requires that a non-resident defendant be subjected to a judgment *in personam* only if he has minimum contacts with the forum such that "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice;'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).... the absence of physical contacts will not defeat *in personam* jurisdiction where a commercial actor purposefully directs his activities toward citizens of the forum State and litigation results from injuries arising out of or relating to those activities. *Burger King Corp. v. Rudzewicz*, [471] U.S. [462, 472–73], 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985). In such a case, "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

*Masada Inv. Corp. v. Allen*, 697 S.W.2d 332, 334 (Tenn.1985).

The "minimum contacts" test, as it is commonly referred, first requires the court to identify the contacts between the non-resident and the forum. The court must then determine whether exercising personal jurisdiction based on these contacts is consistent with traditional notions of fair play and substantial justice. *Davis Kidd Booksellers, Inc. v. Day–Impex, Ltd.*, 832 S.W.2d 572, 575 (Tenn.App.1992). *Davis Kidd* held that both steps entail "a careful, not mechanical, analysis of the facts of each case with particular focus on the defendant, the forum, and the nature of the litigation." *Davis Kidd*, 832 S.W.2d at 575. Determination of the second half of the analysis should include consideration of "the burden on the defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, the judicial system's interest in obtaining the most efficient resolution of controversies, and the state's

shared interest in furthering fundamental, substantive social policies." *Id.*

HJC primarily relies upon *Davis Kidd* and the United States Supreme Court decision of *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), to argue its position. *Asahi Metal* involved a cross-claim for indemnification (the main suit having been settled) against a Japanese manufacturer of tire valve assemblies (Asahi) by a Taiwanese tire tube manufacturer who incorporated the assemblies when manufacturing a tire alleged defective by the original plaintiff after a motorcycle accident in California. *Asahi*, 480 U.S. at 106, 107 S.Ct. at 1029. The Taiwanese manufacturer sold its finished product throughout the world including the United States, with 20% of its sales occurring in California. *Id.* Affidavits submitted by the respective parties indicated that *Asahi* was aware that the tires incorporating its assemblies would end up in the United States and California, but that Asahi never contemplated that its sales, in Taiwan, to the manufacturer would subject it to lawsuits in California. *Id.* at 107, 107 S.Ct. at 1029–30.

The stated issue in *Asahi* was "whether the mere awareness on the part of a foreign defendant that the components it manufactured, sold, and delivered outside the United States would reach the forum State in the stream of commerce constitutes 'minimum contacts' between the defendant and the forum State...." *Id.* at 105, 107 S.Ct. at 1028. Four justices concluded:

The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into

the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Id.* at 112, 107 S.Ct. at 1032. These justices concluded that no evidence had been presented establishing that *Asahi* had purposefully availed itself of the forum State's market: *Asahi* did no business in the forum State, had no office, agents, employees or property in the state, did no advertising or otherwise solicit business in the state; did not create, control or employ the distribution system that brought its product into the forum State's market; and finally, there was no evidence that *Asahi* designed its product in anticipation of sales in California. *Id.* at 112–13, 107 S.Ct. at 1031–33. Four other justices disagreed and found that any "additional conduct" on behalf of the defendant was not warranted; hence, the defendant's placement of its product into the stream of commerce with an awareness that the final product would be marketed in the forum State was sufficient to constitute an act purposefully directed toward the forum State.[3] *Id.* at 116–17, 107 S.Ct. at 1034–35.

The court in *Davis Kidd,* speaking through Judge Koch, interpreted *Asahi* to conclude: "[e]ven though the United States Supreme Court could not agree on the proper application of the stream of commerce rationale, a majority of the Court agreed upon a decision based upon a more traditional minimum contacts analysis." *Davis Kidd,* 832 S.W.2d at 575. In *Davis Kidd,* the plaintiffs' retail stores were allegedly damaged when a fire sprinkler head burst. Suit was filed against various defendants including the Massachusetts supplier of the sprinkler heads, Day–Impex, the British manufacturer of a component part of the sprinkler head and its exclusive United States distributor, Sprinkler Bulb, a Pennsylvania corporation. *Id.* at 574. Both Sprinkler Bulb and Day–Impex moved to dismiss for lack of personal jurisdiction. In reversing the trial court's denial of such motions, the *Davis Kidd* court expressly rejected the "opportunity" to depart from the traditional minimum contacts analysis and

apply "some version of the 'stream of commerce' analysis discussed but not adopted in [*Asahi* ]." *Id.* The court found the case decidable under the minimum contacts test traditionally applied in Tennessee. *Id.*

*Davis Kidd* rejected the argument that the agreement executed between Day–Impex and Sprinkler Bulb, granting the latter the exclusive right to market the former's product in the United States, constituted sufficient minimum contacts with Tennessee. *Id.* at 575. In reaching its decision, the court noted that these defendants had not sold the product to anyone in Tennessee; had not advertised, solicited orders, or maintained an office or employees in Tennessee; and employees of the respective parties had never traveled to Tennessee to solicit business, nor had their been any physical contact with the state. *Id.* at 576. Furthermore, no evidence was presented that either party controlled the marketing activities of the Massachusetts supplier of the sprinkler head or knew the identity of its customers. *Id. Davis Kidd,* therefore, concluded:

> Under these circumstances, Day–Impex's distribution agreement with Sprinkler Bulb is not the type of agreement contemplated by the *Asahi* court as providing a basis for exercising personal jurisdiction. While it gives Sprinkler Bulb the right to market glass bulbs throughout the United States, it does not mention Tennessee specifically. In the absence of any other conduct by Day–Impex or Sprinkler Bulb directed toward Tennessee, the nationwide distribution agreement is not evidence of a specific intent or purpose to serve the Tennessee market.

*Id.*

We find the foregoing decisions controlling of the instant situation. The various appellees have not persuaded us that *Davis Kidd* is distinguishable because it is a "component part case" or because both the manufacturer and distributor had never sold to any Tennessee business. A thorough reading of the decision leaves this Court to conclude that

---

3. The court nonetheless unanimously agreed that the forum State's exercise of personal jurisdiction over *Asahi* under the circumstances present-

ed would be "unreasonable and unfair." *Asahi,* 480 U.S. at 115–16, 107 S.Ct. at 1033–34.

*Davis Kidd* did not place particular emphasis on the fact that neither party had sold parts in Tennessee. Such finding was necessary only in the sense that the court saw fit to grant both parties' motions for dismissal.

In the case at bar, the facts herein detailed have gone unchallenged by the various Appellees. Thus, we have before us a Korean corporation that does no business in the State of Tennessee, does not advertise or solicit orders in the state, maintains no offices or employees within the state, its employees have never traveled to the state and it has no physical contacts with the forum. In addition, there is no evidence that HJC controlled the marketing activities of its distributors or was even aware that its product would ultimately be sold in Tennessee. There is no evidence that the distributorship agreement between HJC and Sullivan Brothers specifically mentions Tennessee. Although the FG–2 helmet was specifically designed for the American market, there is no indication that it was designed for particular distribution in the forum state.

Tennessee undoubtedly has an interest in providing a convenient forum for its residents. *See Davis Kidd*, 832 S.W.2d at 576. We find this interest outweighed by the burdensome task placed upon HJC to defend itself in a foreign arena. Moreover, Mullins may proceed with her suit as against Harley–Davidson and Sullivan Brothers as the trial court obviously has jurisdiction over these defendants. Harley–Davidson, likewise, may continue its suit for indemnity and contribution as to Sullivan Brothers. While we can appreciate the Appellees' argument that a decision such as ours will allow HJC to disclaim total responsibility for its product, we do not agree. HJC will be deterred from manufacturing and importing defective or unsafe products into the United States so long as those who directly purchase and sell its product into the forum state are subject to application of that state's tort law. *See Asahi*, 480 U.S. at 115, 107 S.Ct. at 1033–34.

In view of our decision, it is unnecessary to address the remaining issues. The order denying HJC's motions to dismiss is hereby reversed and this cause is remanded to the trial court for further proceedings herewith

consistent. Costs are taxed equally between Diane Mullins and Harley–Davidson Yamaha BMW of Memphis, Inc., for which execution may issue if necessary.

CRAWFORD, P.J. (W.S.), and HIGHERS, J., concur.