VARGAS v HONG JIN CROWN CORPORATION

Docket No. 222374. Submitted May 10, 2001, at Lansing. Decided August 31, 2001, at 9:05 A.M.

Cindy Vargas, individually and as next friend of Daniel Vargas, a minor, brought a products liability action in the Shiawassee Circuit Court against Hong Jin Crown Corporation (HJC) and Castle Sales Company, seeking damages for injuries sustained by Daniel in a motorcycle accident that occurred while he was wearing a helmet manufactured by HJC. Blue Cross and Blue Shield of Michigan was allowed to intervene in the action as a plaintiff. HJC is a South Korean company that manufactures its helmets in South Korea. It does not do business in Michigan and has no offices, agents, employees, or property in the state. It does not advertise or otherwise solicit business in Michigan and did not create a distribution system that directed its product to Michigan. The helmet involved in this matter was purchased in Michigan from a dealer that purchased it from HJC's Wisconsin distributor, Castle Sales Company. The court, Gerald D. Lostracco, J., denied a motion for summary disposition by HJC that alleged lack of personal jurisdiction over HJC. The court found enough connection between Michigan and HJC to support a finding of limited personal jurisdiction because HJC expected its product to be distributed throughout the Midwest and in Michigan. HJC appealed by leave granted from the order denying its motion.

The Court of Appeals *held*:

1. The plaintiff failed to show that HJC had minimum contacts with Michigan sufficient to establish personal jurisdiction. The hope and expectation of HJC that its product would be marketed throughout the nation, including Michigan, is not sufficient to establish a prima facie case of personal jurisdiction. Even if HJC had a distribution agreement with Castle Sales, that, in and of itself, does not establish that HJC purposefully availed itself of the privilege of conducting activities in Michigan. The evidence does not show that HJC purposefully directed its product into Michigan.

2. The helmet reached Daniel through merely attenuated contacts and a passive availment of Michigan opportunities. The evidence does not show that HJC met the threshold requirement of conduct

and connections with Michigan of such a kind or sort that HJC should reasonably anticipate being haled into court in Michigan. The order of the court must be reversed and the matter must be remanded to the court for entry of a judgment in favor of HJC.

Reversed and remanded.

1. COURTS — LONG-ARM JURISDICTION — FOREIGN DEFENDANTS.

A three-part test is employed to determine whether sufficient minimum contacts exist to support the exercise of limited personal jurisdiction over an out-of-state defendant: the defendant must have purposefully availed itself of the privilege of conducting activities in Michigan, thus invoking the benefits and protections of Michigan's laws; the cause of action must arise from the defendant's activities in the state; and the defendant's activities must be substantially connected with Michigan to make the exercise of jurisdiction over the defendant reasonable; purposeful availment is something more than a passive availment (MCL 600.715).

2. COURTS — LONG-ARM JURISDICTION — FOREIGN DEFENDANTS.

The foreseeability of causing injury in the forum state is not a sufficient benchmark for exercising personal jurisdiction over an out-of-state defendant who has not consented to suit in the forum state; the relevant foreseeability inquiry is whether the defendant's conduct and connections with the forum state are of such a kind or sort that the defendant should reasonably anticipate being haled into court there.

3. COURTS — LONG-ARM JURISDICTION — FOREIGN CORPORATIONS.

An out-of-state manufacturer does not ordinarily have a substantial connection or the requisite minimum contacts with a forum state to justify the exercise of long-arm jurisdiction over the manufacturer unless the manufacturer's products are distributed in the forum state pursuant to its marketing system in such a manner and to such an extent that it can properly be said that the manufacturer has purposefully availed itself of the privilege of conducting activities within the forum state (MCL 600.715).

*Charles L. McCarter* and *John J. Kalo,* for the plaintiff.

*DeNardis, McCandless & Miller, P.C.* (by *William McCandless* and *Michael G. Latiff*), for Hong Jin Crown Corporation.

Before: HOLBROOK, JR., P.J., and HOOD and GRIFFIN, JJ.

GRIFFIN, J. Hong Jin Crown Corporation (hereafter HJC or defendant) appeals by leave granted the circuit court order denying its motion for summary disposition based on lack of personal jurisdiction pursuant to MCR 2.116(C)(1). We reverse and remand.

I

This is a products liability cause of action filed by plaintiff Cindy Vargas individually and as next friend of Daniel Vargas, a minor, who was involved in a motorcycle accident at a motocross event in July 1994. Although Daniel was wearing a helmet manufactured by defendant HJC, he suffered severe head injuries. Daniel's father had purchased the helmet at Specter's Cycles, located in Owosso, Michigan. Defendant HJC is a South Korean company, which manufactures the helmets in South Korea and sells them in the United States to distributors located in California, Massachusetts, and Wisconsin. Specter's Cycles purchased the helmet in question from defendant's Wisconsin distributor, Castle Sales Company.

In 1996, plaintiff filed suit against defendant HJC and other parties, alleging, in pertinent part, that the motorcycle helmet manufactured by HJC was defective. Defendant HJC moved to dismiss for lack of personal jurisdiction pursuant to MCR 2.116(C)(1), asserting that while it shipped its helmets to distributors in the United States, located in states other than Michigan, it did not transact business or directly ship or sell its product to any entities or persons in Michigan. Defendant HJC alleged that the mere fact that its

product reached Michigan through the chain of distribution was, in the absence of other contacts with the state, an insufficient basis on which to impose personal jurisdiction. The trial court denied defendant's motion without prejudice, finding that unresolved questions relevant to the issue existed and needed to be addressed through discovery.

Defendant renewed its motion for summary disposition in July 1999. Plaintiff responded that the court had jurisdiction over defendant pursuant to the long-arm statute, MCL 600.715(2), arguing that defendant had sufficient minimum contacts with Michigan to satisfy due process requirements because it shipped its helmets to distributors in the United States with the intent that they be sold throughout the country and thus purposefully directed its commercial activities toward Michigan residents. Specifically, plaintiff maintained that defendant marketed its product in Michigan through a distributor, Castle Sales, which served as a sales agent for the Michigan market.

Following a hearing on the motion, the trial court concluded that because defendant fully expected its product to be distributed throughout the Midwest and in Michigan, there was "enough connection between Michigan, the forum state, and the manufacturer" to support a finding of limited personal jurisdiction.[1]

---

[1] The trial court held in pertinent part:

> I think this, that in all practicality there's an arrangement between Hong Jin and one of the distributors, Castle . . . whether there's a signed contract or not with Castle, there is knowledge on the part of Hong Jin that their product is being marketed and distributed in this country, not only in this country but by a Midwest distributor, again, Castle, and that it is not only foreseeable, but I think fully expected that the dissemination of the product would be throughout the Midwest, which certainly includes the State of

Defendant now appeals by leave granted the trial court's order denying summary disposition.

II

Jurisdictional rulings are reviewed de novo. *Jeffrey v Rapid American Corp*, 448 Mich 178, 184; 529 NW2d 644 (1995).

> The plaintiff bears the burden of establishing jurisdiction over the defendant, . . . but need only make a prima facie showing of jurisdiction to defeat a motion for summary disposition. The affidavits, together with any other documentary evidence submitted by the parties, must be considered by the court. All factual disputes for the purpose of deciding the motion are resolved in the plaintiff's (nonmovant's) favor. [*Id.* (citations omitted).]

This Court engages in a two-step inquiry in determining whether a Michigan court may exercise limited personal jurisdiction over a defendant: "First, we ascertain if jurisdiction is authorized by MCL 600.715 (Michigan's long-arm statute). Second, we determine if the exercise of jurisdiction is consistent with the requirements of the Due Process Clause of the Four-

---

Michigan. And to narrowly confine that analysis to say, well, it's Wisconsin and not Michigan I think would be really an overly narrow and limiting construction of our Long-arm Statute. I think that with the foreseeability that this product could reach beyond the borders of Wisconsin, I think that expectation is reasonable, I think that there's enough connection between Michigan, the forum state, and the manufacturer to reasonably expect on the part of the defendant-manufacturer that a tort action on a claim of an allegedly defective product manufactured by them would be tried in this state. . . . [O]ne of the persuasive . . . things here is the proximity of Wisconsin, the fact that there's a national distribution and that this product foreseeably is going to end up in a sister state to Wisconsin or in one of the other Midwestern states. So for those reasons, the motion is denied.

teenth Amendment." *Aaronson v Lindsay & Hauer Int'l Ltd*, 235 Mich App 259, 262; 597 NW2d 227 (1999). See also *Jeffrey, supra* at 184-185.

Michigan's long-arm statute, MCL 600.715, authorizes the assertion of limited personal jurisdiction over an out-of-state corporation arising out of the act or acts that create any of five designated relationships between the corporation and the state, the second of which is relevant to this case:

> The existence of any of the following relationships between a corporation or its agent and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise limited personal jurisdiction over such corporation . . . :
>
> \*     \*     \*
>
> (2) The doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort.

### III

In this case, plaintiff contends that because defendant's defective product caused Daniel Vargas' injuries in Michigan, a tort action arose in Michigan, and thus the trial court properly ruled that limited personal jurisdiction was established pursuant to MCL 600.715(2). Defendant does not directly challenge the applicability of subsection 2 of the long-arm statute; rather, the focus of defendant's appellate argument centers on whether the exercise of limited personal jurisdiction comports with the requirements of due process. *Aaronson, supra* at 262.

Resolution of this issue requires a determination whether the defendant "purposefully established 'min-

imum contacts'—a sufficient nexus with Michigan—
so that requiring [it] to defend itself in a suit in Michi-
gan does not offend traditional notions of 'fair play
and substantial justice.' " *Comm'r of Ins v Albino*, 225
Mich App 547, 559; 572 NW2d 21 (1997), quoting *Int'l
Shoe Co v Washington*, 326 US 310, 320; 66 S Ct 154;
90 L Ed 95 (1945). See also *Starbrite Distributing,
Inc v Excelda Mfg Co*, 454 Mich 302, 308-310; 562
NW2d 640 (1997). The minimum-contacts requirement
"protects a defendant from litigating in distant or
inconvenient forums," and "ensures that a state does
not extend its judicial power beyond the limits
imposed on all states by our federal system of govern-
ment." *Jeffrey, supra* at 186. It is appropriate to exer-
cise jurisdiction over a corporate defendant "when it
reaches beyond its own state and purposely avails
itself of the privilege of exploiting forum-based busi-
ness opportunities." *Id.* at 187. A three-part test is
employed to determine whether sufficient minimum
contacts exist:

> "First, the defendant must have purposefully availed him-
> self of the privilege of conducting activities in Michigan,
> thus invoking the benefits and protections of this state's
> laws. Second, the cause of action must arise from the
> defendant's activities in the state. Third, the defendant's
> activities must be substantially connected with Michigan to
> make the exercise of jurisdiction over the defendant rea-
> sonable." [*Id.* at 186, quoting *Mozdy v Lopez*, 197 Mich
> App 356, 359; 494 NW2d 866 (1992).]

See also *Oberlies v Searchmont Resort, Inc*, 246 Mich
App 424; 633 NW2d 408 (2001).

With regard to the first prong of the test, "pur-
poseful availment"

> "is something akin either to a deliberate undertaking to do or cause an act or thing to be done in Michigan or conduct which can be properly regarded as a prime generating cause of the effects resulting in Michigan, something more than a passive availment of Michigan opportunities. The defendant will have reason to foresee being 'haled before' a Michigan court." [*Jeffrey, supra* at 187-188, quoting *Khalaf v Bankers & Shippers Ins Co,* 404 Mich 134, 153-154; 273 NW2d 811 (1978).]

The defendant must deliberately engage in significant activities within a state, or create " 'continuing obligations' between himself and residents of the forum" to the extent that "it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Burger King Corp v Rudzewicz,* 471 US 462, 476; 105 S Ct 2174; 85 L Ed 2d 528 (1985). This requirement " 'ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts . . . .' " *Albino, supra* at 561, quoting *Starbrite, supra* at 310, quoting *Burger King, supra* at 475 (citations omitted).

Moreover, the fact that it is foreseeable that a defendant's product could ultimately cause injury in Michigan is not a sufficient basis on which to premise jurisdiction. As our Supreme Court explained in *Witbeck v Bill Cody's Ranch Inn,* 428 Mich 659, 666-667; 411 NW2d 439 (1987):

> The foreseeability of causing injury in another state is not a "sufficient benchmark" for exercising personal jurisdiction over an out-of-state defendant who has not consented to suit there. *World-Wide Volkswagen Corp v Woodson,* 444 US 286, 295; 100 S Ct 559; 62 L Ed 2d 490 (1980); *Khalaf v Bankers & Shippers Ins Co,* 404 Mich 134, 145; 273 NW2d 811 (1978). Rather, "the foreseeability that is critical to due

process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into Court there." *World-Wide Volkswagen Corp, supra*, 297.

The defendant's contacts with the forum state must be analyzed in terms of the defendant's own actions rather than the unilateral activity of another party or a third person. *Id.* at 667-668. The defendant's lack of a physical presence in the forum state is not determinative. *Id.*; *Jeffrey, supra* at 188. "So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Burger King, supra* at 476.

In *Hapner v Solis Apparatus Manufactories Ltd*, a companion case of *Witbeck v Bill Cody's Ranch Inn, supra* at 674-683, our Supreme Court considered the element of "purposeful availment" in a context analogous to the present circumstances—a products liability action in which the plaintiff was injured in Michigan by an allegedly defective product manufactured by the defendant overseas corporation, shipped to importers in states other than Michigan, and thus introduced into the stream of commerce. In *Hapner*, an Illinois resident purchased a portable hair dryer in Chicago from his barber as a Christmas gift for his daughter, a high school student who at that time lived at home with her parents. She used the dryer on a regular basis and then took it with her when she enrolled and attended the University of Michigan. While in Ann Arbor, the plaintiff daughter was injured by electrical shocks and suffered burns on both hands when the dryer came apart. The plaintiffs

(father and daughter) brought suit in Michigan against, among other parties, the Swiss manufacturer of the hair dryer, Solis Apparatus Manufactories Ltd. In ascertaining the reach of Michigan's long-arm statute with regard to the defendant manufacturer, the *Hapner* Court focused on the issue "whether the action of an out-of-state defendant must be more purposefully directed at the forum state than the mere act of placing a product in the stream of commerce," *id.* at 676-677, and noted:

> In its most recent pronouncement on this issue, a plurality of the United States Supreme Court determined that mere awareness on the part of a foreign defendant that components it manufactured, sold, and delivered outside the United States would reach the forum state in the stream of commerce would not meet federal due process tests. In *Asahi Metal Ind Co, Ltd v Superior Court of California,* 480 US 102, 112; 107 S Ct 1026; 94 L Ed 2d 92, 104 (1987), the plurality, speaking through Justice O'Connor, stated:
>
> "The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum state."
>
> Although the debate continues, we note that this position is not inconsistent with reasoning articulated by Justice LEVIN when *Hapner* was earlier before this Court.
>
> "Unless products of the manufacturer are distributed in this state pursuant to its marketing system *in such a man-*

*ner and to such an extent* that it can properly be said that the manufacturer has 'purposefully avail[ed] itself of the privilege of conducting activities' within this state, it does not ordinarily have 'substantial connection' or requisite minimum contacts with this state justifying the exercise of long-arm jurisdiction." [*Hapner v Rolf Brauchli, Inc*, 404 Mich 160, 168-169; 273 NW2d 822 (1978) (opinion of LEVIN, J.). Emphasis supplied.]

The standard we imposed upon remand required plaintiff to demonstrate that the action of defendant was more purposefully directed at the forum state than the mere act of placing a product in the stream of commerce. *Due process presumes a firm foundation—i.e., specific facts which show affirmatively that the out-of-state defendant's marketing system is the kind from which a reasonable inference may be drawn that channels of commerce leading to the forum state have been chosen, so that the defendant might reasonably have anticipated being sued there.* [*Id.* at 677-678 (emphasis added).]

Applying this standard to the facts before it, the *Hapner* Court scrutinized Solis' business patterns and activity in Michigan. Although it was ascertained that Solis sold its products f.o.b. Switzerland to three independent importers located in New York, Illinois, and California, the Court, *supra* at 680-682, found the plaintiffs' proofs relating to Solis' specific contacts with Michigan to be deficient because they were vague and did not bear on the relevant time frame:

To be subject to personal jurisdiction, a nonresident defendant's contacts with the forum state must exist at the time the cause of action arose or, at the very least, before or at the time of commencement of the action . . . . Only then can it be said that the nonresident had notice of potential liability that might arise from its contacts with the forum state . . . .

\*          \*          \*

The [proofs] establish[] only that Solis' products were available in Michigan in 1979 and 1980. Such evidence does not demonstrate that Solis had reason fourteen years earlier to expect that it would be haled before a Michigan court.

\*     \*     \*

Plaintiffs' postremand proofs are deficient in another respect. They provide no direct evidence concerning the "manner" or "extent" of distribution, if any, by Solis of its products in Michigan during the relevant time period. . . .

\*     \*     \*

The . . . answers to interrogatories do no more than state that at least one Solis product was sold in Michigan during each of the years 1969-1974. The answers provide no information as to manner or extent of distribution in any given year or group of years.

Plaintiffs bear the burden of proving that distribution of Solis' products in Michigan was so extensive that it established a connection with the state sufficient to justify the exercise of personal jurisdiction. We conclude that the postremand evidence is too attenuated to be deemed "purposeful availment"; it indicates at most a "passive availment of Michigan opportunities." *Khalaf, supra,* 153-154.

The Court concluded the trial court did not clearly err in finding the plaintiffs had failed to produce sufficient evidence to demonstrate that the defendant had purposefully availed itself of the privilege of conducting activities within this state.

In the instant case, defendant HJC points out that in two other products liability cases in which it has been involved as a party defendant, the courts have dismissed the cause of action against HJC on the basis of lack of in personam jurisdiction.

In *Mullins v Harley-Davidson Yamaha BMW of Memphis, Inc,* 924 SW2d 907 (Tenn App, 1996), the

Tennessee Court of Appeals held that the sale of HJC's helmets in that state, without more, did not constitute the requisite "minimum contacts" necessary to assert in personam jurisdiction over the foreign manufacturer (HJC). In *Mullins*, the surviving spouse and personal representative of the estate of a motorcyclist killed in a vehicular accident filed suit, alleging that HJC's defectively designed and manufactured motorcycle helmet caused the decedent's death. HJC had shipped the helmet in question from its plant in South Korea to Sullivan Brothers in Massachusetts, one of its three United States distributors. Sullivan Brothers then sold and shipped the helmet to a retailer in Tennessee, where it was purchased by the plaintiff's decedent. In concluding that the trial court had erroneously denied HJC's motion to dismiss for lack of personal jurisdiction, the *Mullins* court, *supra* at 912, stated:

> [W]e have before us a Korean corporation that does no business in the State of Tennessee, does not advertise or solicit orders in the state, maintains no offices or employees within the state, its employees have never traveled to the state and it has no physical contacts with the forum. In addition, there is no evidence that HJC controlled the marketing activities of its distributors or was even aware that its product would ultimately be sold in Tennessee. There is no evidence that the distributorship agreement between HJC and Sullivan Brothers specifically mentions Tennessee. Although the FG-2 helmet was specifically designed for the American market, there is no indication that it was designed for particular distribution in the forum state.
>
> Tennessee undoubtedly has an interest in providing a convenient forum for its residents. See *Davis Kidd [Booksellers, Inc v Day-Impex, Ltd*, 832 SW2d 572, 576 (Tenn App, 1992)]. We find this interest outweighed by the burdensome task placed upon HJC to defend itself in a foreign

arena. . . . While we can appreciate the Appellees' argument
that a decision such as ours will allow HJC to disclaim total
responsibility for its product, we do not agree. HJC will be
deterred from manufacturing and importing defective or
unsafe products into the United States so long as those who
directly purchase and sell its product into the forum state
are subject to application of that state's tort law. See *Asahi*,
480 US at 115, 107 S Ct at 1033-34.

A similar result was obtained in federal court pro-
ceedings in Michigan in which HJC was a party defen-
dant. In *Avery v Hong Jin Crown Corp*, unpublished
memorandum opinion and order of the federal district
court for the eastern district of Michigan issued Feb-
ruary 28, 1997 (Case No. 96CV-73443-DT), a suit was
instituted against HJC after the plaintiff motorcyclist,
wearing an HJC motorcycle helmet, was struck by a
van and seriously injured on a Michigan highway. The
helmet had been purchased from a local retailer, who,
in turn, had purchased the helmet from the same Wis-
consin distributor involved herein, Castle Sales. Citing
the jurisdictional principles set forth in *Witbeck*,
*supra*, Federal District Judge Denise Page Hood con-
cluded that HJC's contacts with Michigan were too ten-
uous to establish personal jurisdiction and conse-
quently granted HJC's motion to dismiss for lack of
jurisdiction:

> Defendant HJC is a corporation organized under the laws
> of South Korea. Defendant HJC alleges that it does not main-
> tain a place of business in the State of Michigan. HJC does
> not engage or participate in the business of designing, man-
> ufacturing, fabricating, distributing, selling or assembling of
> motorcycle helmets in the State of Michigan. It does not
> have any officer, agent, representative or employee in the
> State of Michigan. HJC does not have a resident agent in
> Michigan. Defendant HJC has never owned, possessed or

controlled any property in Michigan. Defendant HJC manufactures helmets in South Korea. All HJC helmets are shipped directly by HJC from South Korea to four entities in the United States: Castle Sales in Wisconsin, a co-defendant in this action, Helmet House, Sullivan Brothers and Kawasaki. HJC does not sell or ship any motorcycle helmets or any other products directly into the State of Michigan or to any other dealerships, other than the four mentioned above. Defendant HJC does not participate in any promotion or pay any incentives for the promotion of any products in the State of Michigan. HJC does not create or control the distribution system which brought any of its products into the State of Michigan.

*　　*　　*

Here, the "distributor" at issue is a Wisconsin corporation. No agreements, oral or otherwise, have been made by . . . HJC . . . with any business entity here in Michigan. Defendant Castle Sales, through is [sic] President, has expressly state[d] that it has no distributorship agreement with Defendant HJC . . . . Defendant Castle Sales has also expressly stated that it alone solicits business in Michigan, without approval of its brochures by defendant HJC . . . . Plaintiff has submitted no other evidence to support its burden that Defendants HJC . . . are subject to this Court's personal jurisdiction.

Plaintiff has not demonstrated that this Court has personal jurisdiction over HJC . . . . While minimum contacts may exist with respect to Castle Sales and the State of Michigan, Plaintiff has not shown that the quantity, quality or nature of Defendants' activities and those activities' relationship to the State of Michigan are such that they should reasonably anticipate being brought into court here. The appearance of HJC's trademark in Castle Sales' brochure is not sufficient for this Court to exercise jurisdiction over HJC because HJC did not have any control over or input into the brochures Castle Sales mailed to Michigan. There has been no showing that HJC made any contacts with anyone in Michigan as a result of the advertisement mailed by Castle Sales. *Witbeck*, 428 Mich at 671. Even if Defendant HJC's

> intent was to sell its products all over the United States, the foreseeability of causing injury in another state is not a "sufficient benchmark" for exercising personal jurisdiction over an out-of-state defendant who has not consented to be sued in Michigan. *Id.* at 666-667. Defendants HJC . . . did not have an agreement with Castle Sales for Castle Sales to distribute the products on behalf of HJC . . . in Michigan.

The extent of HJC's commercial interaction with the forum states in *Mullins* and *Avery* is virtually identical to its contacts with Michigan in the case now before us. Indeed, in light of the proofs set forth below, we find the reasoning employed by the *Mullins* and *Avery* courts to be persuasive and equally applicable to the present circumstances, thereby justifying a similar conclusion that plaintiff has failed to show that defendant HJC has "minimum contacts" with Michigan sufficient to establish personal jurisdiction.

In the instant case, the proofs submitted with regard to the issue of personal jurisdiction consist primarily of the affidavit and deposition testimony of Scott S. Hong, vice president of defendant HJC. Hong stated in an affidavit that HJC is a South Korean company that manufactures, among other items, motorcycle helmets. The motorcycle helmets are made at the HJC factory in South Korea. Although HJC maintains a regional office in California, the California office is not a manufacturing facility. In 1986, defendant purportedly entered into an exclusive written sales and distribution agreement with three companies,[2] Helmet House in California, Castle Sales in Wisconsin, and Sullivan Brothers in Massachusetts, in order to "ex-

---

[2] At the time of litigation, a fourth distributor, Kawasaki USA in California, was also selling defendant's helmets.

pand[ ] sales into the States market."[3] The three distributors agreed to "properly market and distribute Crown brand products in order to maximize sales volume in the States," and further agreed that between them, they would import $600,000 worth of HJC products annually and generate sales of $150,000 quarterly. However, the only actual signatories to the agreement were defendant HJC and Helmet House. Hong testified

---

[3] The "Exclusive Sales and Distribution Agreement" states in pertinent part:

This exclusive sales and distribution agreement is made by and between Hong Jin Industry Co. . . . herein after referred to as "Crown," . . . and Helmet House, Inc., . . . Castle Sales Co., . . . and Sullivan Brothers Inc., . . . herein after referred to as "Sales Group."

*RECITALS*

A) Crown is in the business of manufacturing motorcycle helmets and relative accessories for motorcyclist[s] and is expanding sales into the states market.

B) Crown and Sales Group desire to enter into a business relationship whereby the Sales Group will act as the exclusive sales and distribution representatives of Crown brand products in the states market on the terms and conditions herein after set forth.

*AGREEMENT*

1) The Sales Group agrees to maintain enough inventories of Crown brand products.

2) The Sales Group agrees to properly market and distribute Crown brand products in order to maximize sales volume in the states.

3) The Sales Group agrees not to sell any other brands products than "Shoki" from Japan and "Crown" from Korea.

4) The Sales Group agrees to import Crown brand products to the amount of not less than U.S. 600,000.00 dollars per annum and also agrees to guarantee U.S. 150,000.00 dollars purchase per quarterly basis.

5) Crown agrees to provide the Sales Group with exclusive right of Crown brand products in the states.

that "while it [the distribution agreement] was not something that was directly done with and between Castle Sales and us, nonetheless I was certainly under the belief that it was also applicable to Castle Sales." He explained that HJC "requested Helmet House to handle at least a certain dollar amount" of defendant's product, and because Helmet House "felt that it may be a little difficult for them to digest that all of that on their own and therefore they would bring in maybe something like Castle Sales and Sullivan Brothers, and I think that's what the significance [of the agreement signed only by Helmet House] may have been." Hong testified that "[t]here never was any time when anything in terms of a specific quantity or a specific dollar amount had been established between us and Castle Sales." In 1993-94, defendant shipped "in excess of 200,000 units" to the United States, constituting forty to fifty percent of its total production.

Hong testified during his deposition that when he entered into the agreement with Helmet House, he foresaw that defendant's helmets would be sold throughout the United States; however, Hong stated in his affidavit that defendant did not sell directly to the dealers and did not suggest names of dealers to any of the distributors. According to Hong, each distributor "is free to sell to any dealer of its choosing anywhere in the United States." Hong further represented that defendant HJC does not ship helmets or other products to Michigan, and does not transact business, own property, promote, advertise, or conduct business in Michigan, maintain an office or resident agents in Michigan, or have any other contact with the state. Spencer's Cycles, the retailer that sold

the HJC helmet to Daniel Vargas' father, ordered the helmet from a catalogue sent to it by Castle Sales.

Plaintiff argues that by virtue of the purported distribution agreement with Castle Sales, a Wisconsin corporation, defendant HJC created a strong distribution channel for its helmets in mid-west America and therefore purposefully availed itself of Michigan. Plaintiff attempts to distinguish the present case from *Mullins* and *Avery*, citing Scott Hong's admission that he foresaw that HJC helmets might be sold throughout the United States and his further testimony that he believed the written distribution agreement applied to Castle Sales. However, we conclude that Hong's statements in this regard are not determinative of the outcome in this action.

First, the evidence of record does not establish that defendant had an exclusive written distribution agreement with Castle Sales. Although HJC apparently intended to enter into such an agreement with Helmet House, Castle Sales, and Sullivan Brothers, the only written agreement it actually consummated was with Helmet House. Hong testified that no specific terms intrinsic to a distribution agreement—i.e., expected sales quotas, either in dollar amounts or units sold— were ever established between defendant and Castle Sales. In any event, even assuming arguendo the existence of such a contract, a distribution agreement with a company in a nearby "sister" state, in and of itself, is not sufficient to establish that defendant purposefully availed itself of the privilege of conducting activities in Michigan. The purported distribution agreement between defendant HJC and the "Sales Group" does not specify a particular state or area in the United States to which the distributor must direct

the helmets and hence does not adequately support plaintiff's theory that defendant created a distribution system by which its product was purposefully directed into Michigan. Defendant's hope and expectation that its product would be marketed throughout the nation, including Michigan, is not sufficient to establish a prima facie case of personal jurisdiction. *Hapner, supra* at 677-678.

Second, the record does not indicate with sufficient specificity the extent to which defendant penetrated the Michigan market at the time of Daniel Vargas' accident. Essential to plaintiff's prima facie case, but lacking herein, is evidence regarding the pervasiveness of the distribution of defendant's product in Michigan through its Midwest distributor, Castle Sales, during the pertinent time. *Id.* at 678, 681. The dearth of proofs in this regard, considered in conjunction with the unrefuted evidence, consisting of Hong's affidavit and deposition testimony, showing that defendant HJC did not do business in Michigan and had no offices, agents, employees, or property in the state, and did not advertise or otherwise solicit business in Michigan or create a distribution system that directed its product to Michigan, leads us to conclude that defendant's product reached Daniel Vargas through merely "attenuated" contacts and a "passive availment" of Michigan opportunities. As the *Hapner* Court emphasized, "[u]nless products of the manufacturer are distributed in this state pursuant to its marketing system *in such a manner and to such an extent* that it can properly be said that the manufacturer has 'purposefully avail[ed] itself of the privilege of conducting activities' within this state, it does not ordinarily have 'substantial connection' or requisite

minimum contacts with this state justifying the exercise of long-arm jurisdiction." *Id.* at 681, quoting *Hapner, supra,* 404 Mich 168-169 (opinion of LEVIN, J.) (emphasis supplied). Consequently, the reach of Michigan's long-arm statute, MCL 600.715(2), does not extend to defendant HJC.

In sum, we conclude the trial court erred in denying defendant's motion for summary disposition on the ground that it was foreseeable that defendant's product, distributed by Castle Sales in Wisconsin, would eventually reach the "sister" state of Michigan. The "foreseeability of causing injury in another state is not a 'sufficient benchmark' for exercising personal jurisdiction over an out-of-state defendant who has not consented to suit there." *Witbeck, supra* at 666-667. Instead, the relevant foreseeability inquiry is whether the defendant's conduct and connections with the forum state are of a kind or sort that the defendant should reasonably anticipate being haled into court there. *Id.* In the present case, this threshold requirement has not been demonstrated.

Reversed and remanded to the trial court for entry of a judgment in favor of defendant HJC.